IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Monte Dexter Pepper,<br><br>        Plaintiff,<br><br>vs.<br><br>Precision Valve Corporation,<br><br>        Defendant. | Civil Action No. 6:10-cv-2532-MGL-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

   This matter is before the court on the defendant's motion for summary judgment (doc. 46). In his amended complaint, the plaintiff alleges claims for race discrimination, retaliation, and race harassment under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 1981, and the South Carolina Human Affairs Law ("SCHAL") against his former employer.

   Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Civil Rule 73.02(B)(2)(g) DSC, all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

   On February 27, 2012, the defendant filed a motion for summary judgment (doc. 46), and on March 15, 2012, the plaintiff filed a response in opposition (doc. 48). On March 26, 2012, the defendant filed a reply to plaintiff's response (doc. 51), and on April 6, 2012, the plaintiff filed a sur-reply (doc. 52).

## FACTS PRESENTED

   The defendant manufactures aerosol valves and operates a manufacturing facility in Travelers Rest, South Carolina. The defendant hired the plaintiff, who is an African-American male, in August 2008 as a third shift stamping press operator. The plaintiff's job duties required him to confirm and verify the correct material usage in

producing valves and to run "aluminum through a press operator that stamp[s] and make[s] cups" (pl. dep. 47).

The defendant's attendance policy specifically stated that, "An employee who is absent from work two (2) consecutive scheduled workdays without notifying the Company will be considered voluntary quit and subsequently terminated" (def. m.s.j., ex. 2, p. 0249). The defendant also maintained and enforced an equal employment opportunity policy that prohibited discrimination against job applicants and employees on the basis of race, age, religion, gender, color, national origin, pregnancy, disability, and all other protected classifications (def. m.s.j., ex. 3, p.0004). Similarly, the defendant also maintained and enforced a workplace harassment policy that prohibited all unlawful harassment, including harassment based on race and/or sex, encouraged employees to immediately report harassment to various Company officials, and prohibited retaliation against employees who allege harassment (def. m.s.j., ex. 4, pp. 0236-0237). During the plaintiff's deposition, he admitted that the defendant provided him with these policies during his employment and that he read and understood them (pl. dep. 50, 203-205).

The defendant disciplined the plaintiff several times during 2009 for the following infractions of the attendance policy:

- Verbal warning on February 26, 2009, for two unexcused absences that occurred in January 2009;

- Written warning on April 7, 2009, for two unexcused absences that occurred in April 2009;

- Final written warning on June 15, 2009, for an unexcused absence that occurred in June 2009;

- Verbal warning on July 10, 2009, for tardies that occurred in May, June, and July 2009; and

- Verbal warning on July 28, 2009, for failing to properly clock-in/out on three occasions in June 2009.

(def. m.s.j., ex. 8, p. 0053).

2

On June 27, 2009, the defendant fired the plaintiff because he produced 300,000 defective parts[1] (def. m.s.j., ex. 5, p. 0055). After reconsidering the issue, the defendant ultimately reinstated the plaintiff, paid him for the five days of work that he missed while the defendant investigated the situation, and reprimanded him with a written warning (def. m.s.j., ex. 5, p. 0055; pl. dep. 59).

The plaintiff believed the reprimand was unjust because the two white employees set up the machine incorrectly and the Quality Control Inspectors who approved the incorrect parts were not disciplined (pl. dep. 54-64). The defendant notes that it is not the job of Quality Control to load or run correct materials and that Quality Control employees did their job in catching the bad and incorrect parts run by the plaintiff (def. m.s.j., ex. 6, p. 0050).

The plaintiff filed a Charge of Discrimination with the South Carolina Human Affairs Commission on July 23, 2009, alleging that he had been unfairly reprimanded for that incident and that he had been previously denied a transfer to first shift because of his race (pl. dep., ex. 6).

On October 12, 2009, the plaintiff produced 238,000 defective parts, and the defendant gave him a final written warning for that infraction (def. m.s.j., ex. 7, p. 0058). The plaintiff refused to sign the warning and alleges that it is discriminatory and retaliatory because Brian Hayes, who was later promoted to lead man, ran over a million defective parts, and the defendant did not reprimand him or even make a record of the rejected parts (pl. dep 133-34). The defendant's records indicate that the plaintiff produced more defective parts that the three white operators combined who worked on the plaintiff's shift, Mr. Hayes, Andy Fowler, and Greg Tarbuck (def. m.s.j., ex. 8, p. 0053; Johnson dep. 50-51). The

---

[1] The defendant issues a written warning whenever an employee's actions result in rejection of at least 80,000 parts. Repeated rejections can result in termination of employment (Larry Johnson dep. 35-36).

defendant's Production Manager, Larry Johnson, testified that he did not remember Mr. Hayes producing a million defective parts, and, if Mr. Hayes had produced defective parts in excess numbers, there would be a record of it (Johnson dep. 50-51). The plaintiff also alleges that he "heard" Mr. Johnson's wife produced defective parts prior to her promotion (pl. dep. 112). Ms. Johnson did not report to Mr. Johnson, and she worked in Quality Control and not in a production capacity (Johnson dep. 36-37).

Mr. Johnson summarized his evaluation of the plaintiff's unsatisfactory job performance as follows:

> Mr. Pepper was in my opinion and facts stated that he was not quality conscious of his job. He had no respect for management, not even respect for his peers on the floor. Only certain individuals did he even speak to on the floor. . . . [E]verybody on the floor has job duties. And in my opinion Monte Pepper came short of performing those duties as expected by myself and Precision Valve.

(Johnson dep. 26-27). He further testified that the unsatisfactory performance included excessive rejection of parts, poor attendance, walking away from jobs to visit other departments, being away from his assigned tasks, and using his cell phone during production hours and non-break time (Johnson dep. 27).

The plaintiff alleged that he applied for a promotion to a maintenance position, but he did not know any of the specifics surrounding the decision, such as the qualifications of the successful applicant or the name and position of the decision maker (pl. dep. 136-37) The plaintiff believed that his failure to attain a maintenance position was race-related[2] because only one African-American, Mustafa [last name unknown], worked in the

---

[2]The plaintiff argues that his allegations about promotions being unavailable to black employees is supported by the affidavit of a former employee, Angela Cheatham (pl. resp. m.s.j. 8; pl. dep., ex. 2). It is noted in the statement that it is made "under oath," but it is not signed by a notary. Pursuant to 28 U.S.C. § 1746, an unsworn statement is admissible at the summary judgment stage only if the witness certifies that the unsworn statement is "true under penalty of perjury." 28 U.S.C. § 1746. No such certification is included in Ms. Cheatham's statement. Based upon the foregoing, Ms. Cheatham's statement is inadmissible for the purposes of summary judgment.

4

Maintenance Department (pl. dep. 137-38, ex. 2; pl. resp. m.s.j. 8). The plaintiff has no evidence regarding any white employee who received any promotion that he sought, including any evidence regarding the relative qualifications of those who received such positions (pl. dep. 183).

The plaintiff claims he applied repeatedly for a transfer to first shift, but the defendant denied his requests because he had received disciplinary reprimands or write-ups (pl. dep. 71-72). He claims that the defendant, however, did transfer other employees who had received disciplinary reprimands, including Derrick Hanberry, who is African-American (pl. dep. 76, 104). He also claims that at one point the "whole entire stamping crew went on first [shift] except me" (pl. dep. 67-68, 185-90). The plaintiff claims that Greg Torbert, who is white, was moved to first shift despite having run bad parts (pl. dep. 66-67). The plaintiff, however, also admitted that Theo Braddock, who is an African-American, was transferred to first shift (pl. dep. 68-69). The plaintiff also admitted that Mr. Johnson offered an African-American female, Debbie Barton, the opportunity to transfer to first shift (pl. dep. 102).

The plaintiff testified that he never received a pay raise in his time working for the defendant. He further testified that he observed white employees receiving pay raises, but he never saw a black employee receive one (pl. dep. 151-53). However, the plaintiff admitted that he had no access to payroll records and thus was unaware of each employee's compensation (pl. dep. 151-52). He further admitted that the defendant possibly gave raises to African-American employees, and he produced no evidence showing any race-based disparities in pay (pl. dep. 153). Mr. Johnson testified that the defendant gave Derrick Hanberry, who is an African-American, a pay raise when he was transferred to a first shift position (Johnson dep. 52).

The plaintiff testified that he requested a schedule change so that he could attend college classes in business and management (pl. dep. 142-43). His requests were

5

denied, but he observed a white employee, Ray West, get a shift change to accommodate his educational pursuits (pl. dep. 139-48). The plaintiff did not produce any evidence of the job-relatedness of Mr. West's courses or whether Mr. West had any pending reprimands in his file (pl. dep. 141-43). He also contends that the defendant allowed Andy Fowler, a white employee, to work on a special work shift so that he could attend school (pl. dep. 139-45). The plaintiff did not know who made the decision to allow the special schedule or whether Mr. Fowler had any pending disciplinary reprimands (pl. dep. 146, 148). The plaintiff claims that a white employee, Steven Kerbs, applied for education assistance from the defendant and produced a copy of Mr. Kerbs' application form that was found in the plant (pl. dep. 168, ex. 3). However, the plaintiff further testified that he did not know whether the defendant granted Mr. Kerbs' request for assistance (pl. dep. 168).

The plaintiff alleges that after he filed the Charge of Discrimination, Larry Johnson was "picking at [him] constantly" (pl. dep. 98). He further claims that Mr. Johnson yelled at him, refused to call him by name, and whistled at him (pl. dep. 82, 93-94). The plaintiff admitted that Mr. Johnson whistled at "a lot of people," there "may have been some white [employees]" at whom he whistled, and white employees complained about Mr. Johnson (pl. dep. 100, 106).

The plaintiff alleges that Mr. Johnson "stopped [him] from getting overtime" (pl. dep. 94). He further claims that Brian Hayes told him that he could no longer allow him to work overtime in the valve department "because of Larry" (pl. dep. 96).[3] The defendant

---

[3] The plaintiff claims that he has direct evidence of the defendant's retaliation in a statement made to him by Danny Bowers that the reason he could not work overtime was that "the Company had issues with him" (pl. resp. m.s.j. 5 (citing pl. dep. 98-99)). The plaintiff also claims that on August 24, 2010, Mr. Bowers and Larry Johnson "threatened to discharge him for taking 'paid time off' he was entitled to under the Company's leave policy to attend to family responsibilities" (pl. resp. m.s.j. 4 (citing pl. dep. 95-96); *see* amended comp. ¶ 23). The portions of his deposition containing the statements cited by the plaintiff are not included as an exhibit to the plaintiff's response brief (*see generally* doc. 48-1), and the particular statements and incidents alleged cannot be found in the excerpts submitted by the defendant (*see* doc. 46-2 at 96, 98). The defendant has submitted evidence that Mr. Bowers never supervised or managed the plaintiff and did not have any control over his hours or working conditions (def. m.s.j., ex. 6, p. 0042).

6

submitted records showing that only two employees in the plaintiff's department worked more overtime than the plaintiff in 2009 and that the plaintiff worked more overtime than five co-workers in his department (def. m.s.j., ex. 11, pp. 0044-0046). Theo Braddock, who is African-American, worked the most overtime in the department, as the plaintiff admitted during his deposition (pl. dep. 213-15). The plaintiff claims that after the company received his Charge of Discrimination, Mr. Johnson began denying him the opportunity to work overtime (pl. resp. m.s.j. 4). Company records show that for the time period between the filing of his charge on July 23, 2009, and April 10, 2010, the plaintiff worked some 50.95 hours of overtime (def. m.s.j., ex. 11, pp. 0044-0046). The plaintiff also alleged that an African-American employee from New York worked a disproportionate amount of overtime and that the "New York people worked all the overtime they wanted" (pl. dep. 96-97).

The plaintiff claims that Payroll Manager Gail Dilworth singled him out by following him out of the plant to ensure that he was clocking out correctly (pl. dep. 79-80). He claims that Supervisor Dave Ostrowski singled him out for criticism because of his race for such things as laughing with other employees returning from a fire drill (pl. dep. 85-86) and for not dumping scrap while other employees were not questioned about the same conduct (pl. dep. 87-88). The plaintiff admitted that the other employees who were laughing after the fire drill include whites and African-Americans (pl. dep. 86-87).

The defendant employs various employees from New York. The plaintiff testified that the defendant "treated all the New York people totally different from me and the–and other black Americans." The plaintiff admitted that some of the New York employees were African-Americans and that the defendant might have treated them more favorably than it treated white employees who were from South Carolina (pl. dep. 83-84).

The plaintiff alleges in his opposition to the motion for summary judgment that he observed "racially offensive material being displayed by white employees with apparent management indifference" (pl. resp. m.s.j. 6). Specifically, he alleges he saw "two small

7

black dolls hanging from hangmen's nooses in the back of a maintenance employee's pickup truck parked in front of the employee entrance" (pl. resp. m.s.j. 6). In his deposition, the plaintiff stated that one of employees who was upset about seeing the figurine took a picture of it and sent it to Mark Ostrowski in an email. The plaintiff testified that "maybe three or four days later," the defendant made the employee remove the figurine. The plaintiff was unsure of the race of the person who displayed the figurine, but he testified the person was "either . . . Indian or Puerto Rican or white." He did not know whether the figurines were religious figures (pl. dep. 154-56).

The plaintiff also observed a "racially offensive picture displayed in the die maintenance area. He found it offensive, as did one of the white employees who was present at the time, and the plaintiff personally removed it (pl. resp. m.s.j. 6-7; pl. dep. 157, 162-65; def. m.s.j., ex. 12). The plaintiff testified the picture was from a newspaper and was of a black woman with the words "Oh no not wrinkles" written at the top. He found the picture discriminatory because "no black person" worked in the die maintenance area (pl. dep. 162-65; *see* def. m.s.j., ex. 12).

The plaintiff filed an Amended Charge of Discrimination on November 17, 2009, alleging retaliatory treatment after the filing of his previous charge (pl. resp. m.s.j., ex. 3).

On June 20, 2011, the plaintiff had surgery on his shoulder. He was terminated from employment on June 22, 2011, which the plaintiff claims was in retaliation for his Charge of Discrimination. Payroll Manager Gail Dilworth testified that the plaintiff was terminated from employment for violating the defendant's attendance policy, which explicitly required termination of any employee who failed to report to work without notice for two consecutive days (Dilworth dep. 18-20). The plaintiff testified that he saw his supervisor, Dave Ostrowski, in the hallway at work and told him that his surgery had been changed "from one date to Monday" (pl. dep. 159). He further testified that he talked to Ms. Dilworth

8

about using his paid time off during the week before his surgery to get prepared for surgery, and she told him that was his supervisor's decision (pl. dep. 159-60). When he talked to his supervisor again, the supervisor told him "he had to get with Gail about it." He testified that Dave Ostrowski called him back later and told him that there was no problem with him taking off the week before his surgery (pl. dep. 160). Ms. Dilworth testified that the plaintiff asked her about taking some time off, and she told him that was up to his supervisor. She further testified that the plaintiff never mentioned his surgery to her (Dilworth dep. 15-16, 24). In his deposition, when asked if he told anyone at the company that he needed to be absent from work on June 20, 21, and 22, the plaintiff responded, "No, . . . I thought they was aware of it, . . . by this being a workers' comp issue" (pl. dep. 160). The plaintiff admitted that he did not give the defendant any written documentation regarding his surgery or the need to take time off from work (pl. dep. 159).

## **APPLICABLE LAW AND ANALYSIS**

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex*

9

*Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds,* 490 U.S. 228 (1989). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248.

*Discrimination*

Because the plaintiff has presented no direct evidence[4] of discrimination, the court will apply the *McDonnell Douglas* burden-shifting method of proof.[5] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To establish a *prima facie* case of discrimination, a plaintiff must prove that: (1) he was in a protected class; (2) he was qualified for the job, and his performance was satisfactory; (3) the employer took an adverse action against him; and (4) the adverse action raised a reasonable inference of

---

[4]Direct evidence consists only of "conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284-85 (4th Cir. 2004) (citation omitted).

[5]The court will apply these same standards to the claims under Title VII, Section 1981, and the SCHAL. *See Mulvey v. Bellsouth Telecomms., Inc.*, C.A. No. 2:08-3547-MBS-BM, 2010 WL 3782852, at *6 n.11 (D.S.C. July 12, 2010) (stating, "[T]he standards applicable to lawsuits under § 1981 are basically the same standards applicable to lawsuits under Title VII, with the same caselaw being used to evaluate a claim under either statute.") (citations omitted); *Chambers v. Medical University Hosp. Authority*, C.A. No. 2:11-cv-0261-RMG-BM, 2012 WL 2888804, at *7 n.9 (D.S.C. May 18, 2012) (stating, "[T]he standards applicable for lawsuits under SCHAL are basically the same as the standards applicable to lawsuits under Title VII.") (citations omitted).

unlawful discrimination. *See Gairola v. Commonwealth of Va. Dept. of Gen. Serv.*, 753 F.2d 1281, 1285 (4th Cir. 1985).

If the plaintiff can establish a *prima facie* case, the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions against the plaintiff. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-55 (1981) (this is a burden of production, not persuasion). If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was pretextual. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). In *Reeves*, the Supreme Court reiterated that evidence of pretext, combined with the plaintiff's *prima facie* case, does not compel judgment for the plaintiff, because "[i]t is not enough ... to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Id.* at 146-47 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993)) (emphasis in original). However, the Court also stated that, under the appropriate circumstances, "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id*. It is the plaintiff's burden to create an inference that the defendant's proffered reason is a pretext for intentional discrimination. *See id.* at 147-48. Pretext analysis does not convert Title VII into a vehicle for challenging unfair – but nondiscriminatory – employment decisions. *Holder v. City of Raleigh*, 867 F.2d 823, 828 (4th Cir. 1989). Conclusory allegations, without more, are insufficient to preclude the granting of the defendant's summary judgment motion. *Ross*, 759 F.2d at 365.

Here, as argued by the defendant, the plaintiff cannot establish the second element of a *prima facie* case as he has failed to rebut or even address the evidence regarding his unsatisfactory work performance. As set forth above, Mr. Johnson testified regarding plaintiff's poor job performance (Johnson dep. 26-27). *See King v. Rumsfeld*, 328 F.3d 145, 149-50 (4th Cir. 2003) (affirming summary judgment for employer in a

discrimination case because plaintiff failed to produce evidence that his job performance met the employer's legitimate expectations and holding that, "For King to establish that his work met appellee's legitimate job performance expectations he had only to offer qualified expert opinion testimony as to (1) appellee's legitimate job performance expectations and (2) analysis and evaluation of King's performance in light of those expectations."); *Newby v. Whitman*, 340 F.Supp.2d 637, 662 (M.D.N.C. 2004) (granting employer's summary judgment motion in a discrimination case and holding that, "Plaintiff cannot establish discrimination by disagreeing with his employer's assessment of his work performance.") (citation omitted).

Furthermore, the plaintiff has failed to show that the defendant's actions raised an inference of unlawful discrimination. The Fourth Circuit Court of Appeals has held that the "essence of Title VII's prohibition of sex [and race] discrimination is that 'similarly situated employees are not to be treated differently solely because they differ with respect to' their sex [and race]." *Wilkie v. Board of Comm'rs*, No. 99-1898, 2000 WL 474200, at *3 (4th Cir., Apr. 19, 2000) (citation omitted). Employees are similarly-situated if they "dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Heyward v. Monroe*, No. 97-2430, 1998 WL 841494, at *2 (4th Cir., Dec. 7, 1998) (citation omitted). As argued by the defendant, the plaintiff repeatedly admits in his deposition and the evidence shows that the defendant provided other African-American employees with the opportunities or benefits that he sought and that the defendant applied the same standards to all employees without regard to race. For instance, the evidence shows that an African-American employee received more overtime than any other employee in the plaintiff's department; the plaintiff believed that the defendant treated New Yorkers, including African-American New Yorkers, more favorably than it treated local employees, which negates an inference of race discrimination; and he

12

failed to produce evidence that similarly-situated employees were treated differently in discipline, training, promotions, transfers, scheduling, shift assignments, allocation of overtime, pay raises, and tuition reimbursement, because of their race. Accordingly, the plaintiff cannot establish a *prima facie* case of race discrimination.

Furthermore, the plaintiff has failed to rebut the defendant's legitimate, non-discriminatory explanation for terminating his employment, which was his violation of the attendance policy when he failed to report to work for two consecutive days without notice. Viewing the evidence in a light most favorable to the plaintiff, he spoke to his supervisor and Ms. Dilworth about using his leave for the week before surgery. However, the plaintiff admitted that he did not tell anyone at the company that he needed to be absent from work on June 20, 21, and 22, 2011, and he did not give the defendant any written documentation regarding his surgery or the need to take time off from work (pl. dep. 159-60).

Based upon the foregoing, summary judgment should be granted on this claim.

### *Retaliation*

The plaintiff alleges that the defendant retaliated against him for filing his Charge of Discrimination. To establish a *prima facie* case of retaliation, a plaintiff must prove that (1) he engaged in a protected activity, (2) the employer acted adversely against him, and (3) there was a causal connection between the protected activity and the asserted adverse action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011). "If a plaintiff 'puts forth sufficient evidence to establish a *prima facie* case of retaliation' and a defendant 'offers a non-discriminatory explanation' for his termination, the plaintiff 'bears the burden of establishing that the employer's proffered explanation is pretext.'" *Id.* (quoting *Yashenko v. Harrah's Casino*, 446 F.3d 541, 551 (4th Cir. 2006)).

The plaintiff has failed to show a causal connection between his protected activity and his termination, or any of the other allegedly retaliatory acts. The cases that

13

accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be 'very close' . . . ." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001). The Fourth Circuit has found that a gap of three to four months is too long to establish temporal proximity, and such an interval is too long to establish causation without other evidence of retaliation. *Lawrence v. Veolia Transp. Servs., Inc.*, C.A. No. 2:07-2722-MBS, 2009 WL 857394, at *4 (D.S.C. 2009); *see Causey v. Balog*, 162 F.3d 795, 8-3 (4th Cir. 1998) ("A thirteen month interval between the charge and termination is too long to establish causation absent other evidence of retaliation."). The plaintiff filed his Charge of Discrimination on July 23, 2009, and he filed his Amended Charge of Discrimination on November 17, 2009. The plaintiff filed his lawsuit in state court on September 28, 2010, and it was later removed to this court. He was terminated from employment on June 22, 2011, nearly two years after his initial charge and ten months after filing his lawsuit. Here, the gap is too long to establish causation without other evidence of retaliation.

Furthermore, even assuming the plaintiff could prove his *prima facie* case, the defendant has shown legitimate, nondiscriminatory reasons for any adverse actions, including disciplining him, terminating his employment, and denying his alleged requests for transfer, promotion, and educational reimbursement. The record is devoid of any evidence that the defendant's stated reasons were not its true reasons and that its adverse employment actions were the result of any retaliatory motive. Based on the foregoing, the defendant is entitled to summary judgment as to the plaintiff's retaliation claim.

***Hostile Work Environment***

The plaintiff also alleges a hostile work environment claim based upon his race. To proceed on a Title VII hostile work environment claim, "a plaintiff must show 'that the offending conduct (1) was unwelcome, (2) was based on [his race], (3) was sufficiently

14

severe or pervasive to alter the conditions of [his] employment and create an abusive work environment, and (4) was imputable to [his] employer.'" *Ziskie v. Mineta*, 547 F.3d 220, 224 (4th Cir. 2008) (quoting *Ocheltree v. Scollon Productions, Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (en banc)). Establishing the third element requires that the plaintiff show that the work environment was not only subjectively hostile, but also objectively so. *See EEOC v. Sunbelt Rentals, Inc.,* 521 F.3d 306, 315 (4th Cir.2008). Such proof depends upon the totality of the circumstances, including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id*. (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)).

  The plaintiff alleges the following in support of his racial harassment claim: 1) Mr. Johnson yelled and whistled at him; however, he whistled at "a lot of people, and " there "may have been some white [employees]" at whom he whistled (pl. dep. 100, 106); 2) Ms. Dilworth followed him out of the plant in an attempt to time his break; 3) Mr. Ostrowski singled him out for criticism for laughing with other employees returning from a fire drill and for not dumping scrap; however, he admitted that the other employees who were laughing included whites and African-Americans (pl. dep. 85-87); 4) he observed "two small black dolls hanging from hangmen's nooses in the back of a maintenance employee's pickup truck parked in front of the employee entrance" (pl. resp. m.s.j. 6), and, "maybe three or four days" after the defendant was made aware of it, the defendant made the employee remove the figurine (pl. dep. 154-56); and 5) a newspaper photo of an African-American female was displayed by employees, which he found discriminatory because "no black person" worked in the die maintenance area (pl. dep. 162-65; *see* def. m.s.j., ex. 12).

  The plaintiff argues weakly that "whether [the conduct] is sufficiently offensive to be considered harassment is a question of fact best left to a jury" and "[w]hether it is racial in nature is also a fact that should be left to the jury" (pl. resp. m.s.j. 5). This court

disagrees. *See Bonner v. Payless Shoe Source*, No. 97-2401, 1998 WL 171342, at *2-3 (4th Cir., Apr. 14, 1998) (affirming summary judgment for employer in a race harassment case, finding that the allegations were not so severe or pervasive to alter the conditions of employment where the plaintiff heard his supervisor use the word "nigger," an African-American co-worker heard the supervisor use the word "nigger" on more than on occasion, and the supervisor attended a Klu Klux Klan rally, tapped the plaintiff's head with a pen, and "would drop his pen on the floor to see if Bonner would pick it up"). Here, the court will assume the referenced conduct was based upon race. However, considering the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance, the plaintiff has failed to show that the alleged conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment. Accordingly, summary judgment should be granted on this claim.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, this court recommends that the defendant's motion for summary judgment (doc. 46) be granted.[6]

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

August 6, 2012
Greenville, South Carolina

---

[6]As alternative bases for summary judgment, the defendant argues: (1) the plaintiff "lied and/or omitted relevant facts on his job application to intentionally mislead the Company and persuade it to hire him," and, had the defendant known the plaintiff's true history, it would not have hired him or would have fired him for lying on the application; and (2) the plaintiff "sought and received Social Security Disability Insurance . . . immediately after his termination of employment - thereby estopping him from seeking relief for back pay and front pay in this case" (def. m.s.j. 26-31). Because this court recommends that summary judgment be granted because the plaintiff cannot prove his claims, these additional bases for summary judgment have not been addressed.